IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

|  |  |  |
|---|---|---|
| CITY OF GREEN BAY, et al., | ) | |
| *Plaintiffs*, | ) | |
| v. | ) | Civil Action No: 20-cv-00479 |
| MARGE BOSTELMANN, et al., | ) | |
| *Defendants*. | ) | |

# BRIEF OF *AMICI CURIAE* DISABILITY RIGHTS WISCONSIN AND ACLU OF WISCONSIN

Wisconsin's government and citizens are responding to the serious public health implications of COVID-19 and must act accordingly to ensure the protection of public safety. Yet even in this extraordinary moment, it remains true that the right to vote is a fundamental right, "preservative of all rights." *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886); *Reynolds v. Sims*, 377 U.S. 533, 562 (1964). Any emergency action must preserve both the State's interest in public safety and this most critical of rights, especially, in the midst of this crisis.

On March 24, the City of Green Bay filed a lawsuit in this Court, seeking, among other relief, declaratory judgment that they have the authority to suspend Wisconsin's election laws and to be held harmless from any voter's resulting disenfranchisement. ECF No. 1, at 28–29. Green Bay also asked that the Court hold that state election administrators, including the Governor, have violated the U.S. Constitution by failing to postpone the April 7, 2020 election. *Id.* *Amici*, Disability Rights Wisconsin and the ACLU of Wisconsin, respectfully seek leave to

submit this brief, to alert this Court and the parties to fundamental principles that must guide any remedies fashioned in this case.

*First*, any result must preserve and maximize the right to vote of all eligible Wisconsin voters. *Amici* do not dispute Plaintiffs' contention that the date of the April 7 election should be extended to provide elections officials and clerks time to revise procedures and practices to ensure that eligible voters are not deprived of their rights in light of the dire situation discussed below.

*Second*, any remedy *must* retain meaningful opportunities for voters throughout the state to vote in person, and thus *Amici* do not agree with Plaintiffs' request for an all-mail election. Given the current public health emergency, it is imperative to expand access to absentee mail-in ballots as much as possible. But voting by mail cannot be the only option. Indeed, mandatory vote by mail would fail to accommodate many voters. This is particularly true for voters with disabilities, who may require accommodations such as accessible voting machines, and voters of color, who may live in communities where mail service is often not as robust as in other communities and may be distrustful of the mail system as the vehicle to exercise their fundamental right to vote. Any relief, including a new election date, must accommodate all voters, and not rely exclusively on means that could have a discriminatory impact on specific populations. Moreover, mandatory vote by mail—especially when Plaintiffs propose only sending ballots to already registered voters—will deprive Wisconsin voters of the opportunity for same day registration that has existed since 1976, and upon which tens of thousands of voters rely. It will disenfranchise those voters.

*Third*, *Amici* urge the Court to require Wisconsin officials to develop a concrete plan to address problems that may arise through April 7 or any rescheduled spring election date, and to

2

ensure that such plans can be swiftly put into effect should the current health emergency continue or recur near the time of upcoming elections scheduled to be held on August 11 and November 3, 2020. Officials must be required to categorically ensure that there are systems in place that preclude the chaos and disorganization that have led to the present litigation, and so that there are no last minute changes in procedures suddenly imposed upon Wisconsin voters and elections officials. Proactive measures should include, but not be limited to, a communications plan that allows elections officials and the public—including those lacking access to or do not use electronic or social media—to be fully informed about rules and regulations that will be in place for those elections.

Finally, the Court must not allow state or local governments to be held harmless for violation of election laws, relief explicitly sought in this case. Doing so would not only deprive voters of their constitutional rights in this election, it would also set a dangerous precedent.

## I. STATEMENT OF INTEREST OF *AMICI CURIAE*

Disability Rights Wisconsin ("DRW") is a statewide non-profit organization designated by the Governor of the State of Wisconsin to act as the congressionally mandated protection and advocacy agency for Wisconsin citizens with mental illness, developmental disabilities and other physical impairments, pursuant to Wis. Stats. § 51.62, 29 U.S.C. § 794e, 42 U.S.C. § 15041 *et. seq.*, and 42 U.S.C. § 10801 *et. seq.* Through the years, DRW has had direct experience promoting the legal rights around voting issues in Wisconsin. This includes advocacy to ensure that people with disabilities have equal access to the polls, education of people with disabilities, service providers and families on voting laws; working with election officials on both the state and local level access to the polls for people with disabilities and working one-one-one with

clients to resolve individual problems with the voting process.  DRW has participated as an amicus in the prior voting rights case of *Milwaukee Branch of the NAACP v. Walker*.[1]

The ACLU of Wisconsin is one of the state affiliates of the American Civil Liberties Union, with 13,500 members and supporters statewide.  The ACLU of Wisconsin has long been concerned about and involved in protecting voting rights of Wisconsin residents.  Since 2004, the ACLU of Wisconsin has been a core participant in the Wisconsin Election Protection coalition, which works to ensure that voters are aware of their voting rights and can freely exercise those rights.  In addition, the ACLU of Wisconsin has been counsel in the District Court, Court of Appeals, and Supreme Court, on the long-running Wisconsin voter ID case, *Frank v. Walker*, No. 11-cv-01128 (E.D. Wis.), and has been an amicus on other cases affecting voting rights, including before the Supreme Court in *Gill v. Whitford*, 138 S. Ct. 1916 (2018).

## II.     FACTUAL BACKGROUND

The rapid spread of COVID-19 has forced state and local county officials, poll workers, and voters to grapple with novel issues, especially how to hold safe, inclusive, and timely elections in this new reality.  Several key events warrant particular emphasis here.

On March 12, 2020, Governor Tony Evers declared a public health emergency to, *inter alia*, "protect all Wisconsinites from the spread of this disease, and to prepare for the impacts it may have on the state."[2]  Also on March 12, the Wisconsin Elections Commission eliminated the Special Voting Deputy process, by which individuals are deputized as clerks to bring ballots to residential care facilities such as nursing homes and help individuals living there vote, and

---

[1] Case No. 2011CV005492 (Dane County, Circuit Court).

[2] Exec. Order No. 72, *Relating to a Proclamation Declaring a Health Emergency in Response to the COVID-19 Coronavirus* (Mar. 12, 2020), https://evers.wi.gov/Documents/EO/EO072-DeclaringHealthEmergencyCOVID-19.pdf.

4

moved polling places out of those care facilities.³ On March 17, the Acting Secretary of the Wisconsin Department of Health issued an order prohibiting gatherings of 10 or more persons and closing all schools in Wisconsin.⁴ While schools and libraries are exempt from the order when used as polling places, the urgency of the situation that led to the order has had significant effects. It also raises concerns that the hastily relocated polling places will be inaccessible to voters with disabilities, despite legal requirements for accessibility.⁵

As the public health emergency has grown, so has the volume of requests for mail-in ballots.⁶ The volume of requests has proved so high that many communities have run out of ballot envelopes.⁷ Exacerbated by staff shortages, these issues have led to inevitable delays mailing ballots to voters. Simultaneously, local elections officials have taken actions that affect elections and limit citizens' ability to vote. This includes the decision by the cities of Milwaukee and Madison, among others, to eliminate in-person early voting, despite the requirement that each municipality provide at least two weeks of early voting before an election.⁸ Wis. Stat.

---

³ Wis. Election Comm'n, *Guidance Regarding Election Procedures and Public Health Emergency* (Mar. 12, 2020), https://elections.wi.gov/sites/elections.wi.gov/files/2020-03/March%2012%20Commission%20Meeting%20Agenda%20and%20Materials.pdf.

⁴ Wis. Dep't of Health Services, *Emergency Order No. 5, Prohibiting Mass Gatherings of 10 People or More* (Mar. 17, 2020), https://elections.wi.gov/sites/elections.wi.gov/files/2020-03/Gov.%20Evers_DHS%20order_3.17.20.pdf.

⁵ *See* Wis. Election Comm'n, *Introduction to Voting Accessibility*, https://elections.wi.gov/voters/accessibility (last accessed Mar. 27, 2020) (outlining some of the requirements for voter accessibility).

⁶ Wis. Election Comm'n, Absentee Ballot Requests for April 7 Exceed 550,000 Amid COVID-19 Concerns (Mar. 24, 2020), https://elections.wi.gov/node/6768.

⁷ Wis. Election Comm'n, Mem. From Meagan Wolfe to Clerks, *Absentee Envelope Order Status and Delivery Details COVID-19* (Mar. 20, 2020), https://elections.wi.gov/node/6741.

⁸ *See* Laurel White, *Election Officials Across Wisconsin Eliminate, Scale Back In-Person Early Voting*, Wis. Public Radio (Mar. 23, 2020), https://www.wpr.org/election-officials-across-wisconsin-eliminate-scale-back-person-early-voting.

§ 6.86(1)(a)(2). In addition, communities have restricted or eliminated opportunities for voters to register in person and moved polling places while they also lose poll workers—many of whom are elderly and at "high risk" of severe illness from COVID-19—in droves.[9]

These difficulties will only worsen as the State combats the COVID-19 crisis. On March 24, Governor Evers issued a "safer at home" order that restricts the ability of most Wisconsin residents to move freely around their communities.[10] This order exempts elections officials and poll workers, but will certainly heighten the state of concern among Wisconsin's population and make it more difficult to recruit poll workers.

### III. ARGUMENT

*Amici* have reluctantly concluded that they do not dispute Plaintiffs' claim that a free and fair election cannot be held in less than two weeks, during a period when the Governor has prudently ordered Wisconsinites to stay at home to protect their health and that of their neighbors.

*Amici* do not take a stance on which date the spring election should be held, but strongly maintain that, whatever the date, the State must provide necessary accommodations to allow *all* Wisconsin voters to exercise their fundamental right to vote—including providing opportunities for same day registration and in-person voting. The State and municipalities must also establish a clear plan to avoid further chaos before the August and November 2020 elections. And elections officials cannot be held harmless from failing to comply with election laws.

---

[9] Rashad Williams, *State officials encouraging more poll workers to replace older workers for their safety*, WAOM.com (Mar. 24, 2020), https://waow.com/2020/03/24/state-officials-encouraging-more-poll-workers-to-replace-older-workers-for-their-safety/.

[10] Wis. Dep't of Health Services, Emergency Order No. 12, Safer at Home (Mar. 24, 2020), https://evers.wi.gov/Documents/COVID19/EMO12-SaferAtHome.pdf.

### A. *Amici* Do Not Dispute the Request to Extend the Election Date.

*Amici* do not dispute Plaintiffs assertion that it is appropriate to postpone the election: not only in Green Bay, but statewide. The unforeseeable demand for absentee ballots, sudden relocation of polling places—potentially to locations inaccessible to persons with disabilities, significant loss of poll workers, and lack of sanitizing equipment, among innumerable other issues, justifies such a postponement. *Amici* are well aware that the current crisis has led to *ad hoc*, differing actions from municipality to municipality. Mem. in Supp. of Pls.' T.R.O. Mot. and Prelim. Inj., at 2–9, ECF No. 3. *Amici* therefore understand that Plaintiffs see no mechanism, other than a delay of the April 7 election, to avoid chaos and disparate treatment and effectively adopt and implement consistent rules on a statewide basis.

*Amici* are also concerned that the current *ad hoc* emergency actions of various municipalities—many of which violate State law—undermine the equal protection rights of the voters they represent. "A citizen's right to a vote free of arbitrary impairment by state action [is] secured by the Constitution . . . ." *Baker v. Carr*, 369 U.S. 186, 208 (1962). *See also Hunter v. Hamilton Cnty. Bd. of Elections*, 635 F.3d 219, 234 n.13 (6th Cir. 2011) ("The Supreme Court has held in cases since *Snowden* [*v. Hughes,* 321 U.S. 1, 8 (1944)] that the Equal Protection Clause protects the right to vote from invidious and arbitrary discrimination" and "a showing of intentional discrimination has not been required in these cases.").

In *Louisiana v. United States*, the Supreme Court affirmed that voting rights "cannot be obliterated by the use of laws . . . which leave the voting fate of a citizen to the passing whim or impulse of an individual registrar." 380 U.S. 145, 153 (1965). Descending from this precedent, *Bush v. Gore* reaffirmed that the Fourteenth Amendment's Equal Protection Clause forbids the State from, "[h]aving once granted the right to vote on equal terms . . . by later arbitrary and disparate treatment, valu[ing] one person's vote over that of another." 531 U.S. 98, 104–05

(2000). That rule extends beyond "the initial allocation of the franchise" to "the manner of its exercise." *Id*. Only "specific standards" and "uniform rules" provide "sufficient guarantees of equal treatment." *Id.* at 106–07.

Lower courts in this Circuit have held accordingly. In *Black v. McGuffage*, the court found that plaintiffs pled a viable equal protection claim where the challenged statute:

> [left] the choice of voting system up to local authorities. But that choice necessarily means that some authorities will choose a [less accurate] system . . . . [and] voters in some counties are statistically less likely to have their votes counted than voters in other counties in the same state in the same election for the same office.

209 F. Supp. 2d 889, 899 (N.D. Ill. 2002). "Similarly situated persons" were improperly "treated differently in an arbitrary manner." *Id.*; *see also Hunter*, 635 F.3d at 234–36 (counting some provisional ballots cast in wrong precinct due to poll worker error, while not considering evidence of same errors for similarly situated ballots, violates equal protection); *Pierce v. Allegheny Cnty. Bd. of Elections*, 324 F.Supp.2d 684, 690 (W.D. Pa. 2003) (allowing third party delivery of absentee ballots only in some counties violates Fourteenth Amendment and could dilute votes in county where delivery not allowed). The case law makes clear that a state cannot engage in election practices that result in voters being given unequal access to the ballot depending on the community in which they live.

Such actions also raise due process concerns. *See, e.g.*, *Hunter*, 635 F.3d at 235 (arbitrary election administration implicates "both equal-protection and due-process rights"); *League of Women Voters of Ohio v. Brunner*, 548 F.3d 463, 468–70, 477–78 (6th Cir. 2008) (structural electoral dysfunction based on a lack of uniform rules, standards and procedures for such election administration matters as registration lists, polling places, absentee and provisional ballots, and assistance for disabled voters, combined with inadequate poll worker training, could lead to widespread disfranchisement and state a substantive due process claim.) "[S]ubstantial

8

changes to state election procedures and/or the implementation of non-uniform standards run afoul of due process if they 'result in significant disenfranchisement and vote dilution.'" *Ne. Ohio Coal. for Homeless v. Husted*, 696 F.3d 580, 597 (6th Cir. 2012) (internal citations omitted).

At this point, differential and arbitrary treatment and a failure to follow uniform rules already imperil the election's fairness. For example, while State law requires municipalities to provide at least a certain amount of early voting, some municipalities have cancelled it outright, others are allowing voters to make appointments for early voting, others employ curbside voting, and others are conducting early voting as before. Of even greater concern is the likelihood that random and differential treatment will be applied until and including the April 7 election, depriving voters of their voting rights. One has only to look at the recent elections in Illinois to see the profoundly adverse effect on voters of last-minute changes in or closures of polling places and lack of election workers.[11] Allowing the April 7 election to proceed in such a manner could violate the constitutional right to equal protection and due process of Wisconsin's voters.

**B. Wisconsin Must Ensure That Voters Have Opportunity to Vote in Person.**

While *Amici* do not dispute the need for a delay in the election, they do not agree that a fair election can be conducted entirely by mail. Ballots should certainly be mailed to all registered voters; doing so will likely reduce the demand for in-person voting. But as *Amici* know from experience, switching to a mail-only voting system without providing opportunities for in-person voting would disenfranchise countless voters who planned to register at the polls,

---

[11] *See, e.g.*, Kathleen Foody, *Illinois officials point fingers over primary voting issues*, the Associated Press (Mar. 17, 2020), https://apnews.com/c96f7b7a4537785a4d305b986d4df3a2.

lack reliable access to mail service, might have difficulty with the process of applying for and returning a mail ballot, or generally distrust mail service.

Even so-called "vote by mail" states provide alternate opportunities for voters to register and vote in-person:

> Five states currently conduct all elections entirely by mail: Colorado, Hawaii, Oregon, Washington and Utah. At least 21 other states have laws that allow certain smaller elections, such as school board contests, to be conducted by mail. For these elections, all registered voters receive a ballot in the mail. The voter marks the ballot, puts it in a secrecy envelope or sleeve and then into a separate mailing envelope, signs an affidavit on the exterior of the mailing envelope, and returns the package via mail or by dropping it off. . . .
>
> While "all-mail elections" means that every registered voter receives a ballot by mail, *this does not preclude in-person voting opportunities on and/or before Election Day.* For example, despite the fact that all registered voters in Colorado are mailed a ballot, voters can choose to cast a ballot at an in-person vote center during the early voting period or on Election Day (or drop off, or mail, their ballot back).

National Council of State Legislatures, *All Mail Elections (aka Vote by Mail)* (Mar. 24, 2020), https://www.ncsl.org/research/elections-and-campaigns/all-mail-elections.aspx (emphasis added).

While the option of voting by mail is an important safeguard for many, it is not a cure-all. In fact, a mandatory vote-by-mail system without a meaningful in-person option would actually make voting less accessible for many Wisconsin voters. Since 1976, Wisconsin law has allowed voters to register on Election Day.[12] Voters accordingly rely on same day registration as a routine aspect of their voting experience, so much so that in each presidential election since 1984, between about 10 and 15% of voters—hundreds of thousands of people—have registered

---

[12] State of Wisconsin Government Accountability Board, Final Report on the Impacts and Costs of Eliminating Election Day Registration in Wisconsin (Feb. 18, 2013), https://elections.wi.gov/sites/elections.wi.gov/files/publication/65/final_edr_report_02_18_2013_pdf_86368.pdf, at 4.

at the polls.[13]  And while in some years fewer voters may use same day registration during spring elections, the numbers still reach the tens if not hundreds of thousands.[14]  Mailing ballots to registered voters will, of course, help many voters—including persons with fragile health—and likely reduce the burden for in-person voting.  But it will not enfranchise thousands of voters who register for the first time, or re-register to update their names or addresses, at the polls.[15]  Data suggest that recent movers, who must re-register even if they previously voted, are on average younger, of lower income, and are more likely to be racial and ethnic minorities.[16]  These characteristics associated with more frequent moving are also associated with lower overall likelihoods of being registered.[17]  The remedy that Plaintiffs propose will effectively and completely disenfranchise those voters.

Further, traditionally, the vast majority of voters in the United States, including millions of Wisconsinites, cast ballots in person, whether on Election Day itself or during early in-person voting.  More than 2.1 million Wisconsinites voted in-person in the 2016 primary.  And while

---

[13] *Id.* at 1, 5; *see also* Wisconsin Election Commission, Elections and Voting Statistics, General Election Absentee and Voter Registration Statistics 1984-2016 spreadsheet at https://elections.wi.gov/elections-voting/statistics.

[14] Wisconsin Election Commission, 2018 Spring Election EL-190NF: Election Voting and Registration Statistics Report (Apr. 2, 2018), spreadsheet at https://elections.wi.gov/node/5815 (more than 39,600 election day registrants for 2018 spring election); 2016 Spring Election EDR Report spreadsheet at https://elections.wi.gov/publications/statistics/gab-190/2016-spring-election-presidential-primary (more than 259,000 election day registrants for 2016 spring election and presidential primary).

[15] Report on Impacts and Costs of Eliminating Election Day Registration, *supra* n. 12, at 1, 5.

[16] These patterns are evident in many Census datasets and reports. *See, e.g.* David K. Ihrke & Carol S. Faber, *2012. Geographic Mobility: 2005 to 2010*, Current Population Reports, P20-567, Table 2 (U.S. Census Bureau Dec. 2012), https://www.census.gov/prod/2012pubs/p20-567.pdf.

[17] *See generally* Jan E. Leighley & Jonathan Nagler, *Who Votes Now? Demographics, Issues, Inequality, and Turnout in the United States* Table 2 (Princeton Univ. Press. 2013).

there does not appear to be a readily available breakdown of the distribution of in-person and absentee voters for the 2016 general election, the data do show that more than 2 million Wisconsinites—about 73% of all voters—voted in person. Even then, the remaining 27% includes thousands of voters who voted absentee in-person at early voting sites, not by mail.[18] There is no question that there will be many voters who wish or need to vote in person, for a variety of reasons—even in the midst of the current crisis.

In-person voting options and extended early voting can be critical for persons with disabilities, such as blind and visually impaired voters who need to use accessible voting machines at in-person polling sites. It is also especially important for voters of color and young voters. For example, recent data from California, which is experimenting with vote-by-mail, show that older, white voters more frequently vote by mail; in comparison, Black and Hispanic voters and young people are more likely to vote in-person.[19] And a Florida study found that voters of color and young voters were more likely to have their mail absentee ballots rejected than white voters or older voters.[20] Obviously, mailing ballots is not an evident option for transient or homeless voters. *See, e.g.*, *Spirit Lake Tribe v. Benson Co., N.D.*, No. 10-cv-00095, 2010 WL 4226614, at *3 (D.N.D. Oct. 21, 2010) (mail-in only procedures had disparate impact on tribal voters lacking "stable housing arrangements" in communities characterized by "poverty and transience"). And even mail deadlines can adversely affect voters: the U.S. Postal Service

---

[18] Wisconsin Election Commission, Elections and Voting Statistics, General Election Voter Registration and Absentee Statistics 1984-2016, spreadsheet at https://elections.wi.gov/elections-voting/statistics.

[19] Center for Election Innovation & Research, *California Voter's Choice Act November 6, 2018 General Election Report*, https://electioninnovation.org/wp-content/uploads/2020/03/VCA-November-2018-General-Election-Report.pdf.

[20] Dr. Daniel Smith for ACLU of Florida, *Vote-by-Mail Ballots Cast in Florida* (Sept. 2018), https://www.aclufl.org/sites/default/files/aclufl_-_vote_by_mail_-_report.pdf.

itself explicitly recommends that voters leave a full week for a mail ballot to be received,[21] something that may not be possible for voters who receive their ballots near the absentee ballot request deadline, or who choose their preferred candidate later in the cycle.  Indeed, 1407 non-military mailed absentee ballots were received *after* the deadline in Wisconsin's 2019 spring election—a contest with far fewer issues on the ballot, and lacking a high-turnout presidential primary.[22]  Moreover, recent studies suggest that voters of color are more likely to be affected by receipt deadlines: in Arizona, where (as in Wisconsin) ballots must be received by Election Day, a recent expert report found that "[p]eople in counties with the highest Hispanic and Native American populations had the highest rates of late rejected [mail] absentees."

Many voters might also find Wisconsin's vote-by-mail system inaccessible, particularly in the current COVID-19 crisis.  Ensuring and increasing early in-person voting opportunities, as the law in any case requires, is also critical in this moment, so that voters do not all have to show up on one day, which would undermine their opportunity to distance themselves safely from others.

In urging this Court not to order mail balloting as the sole means to vote in Wisconsin's 2020 spring election, *Amici* do not in any way discount the gravity of the public health issues the State faces.  *Amici*'s point is that in-person voting is critically important to many Wisconsin voters, and that the State must plan now for measures that would allow for safe administration of in-person voting at any election that occurs.

---

[21] U.S. Postal Service, Postal *Bulletin 22539 (2/13/20)* at 5, https://about.usps.com/postal-bulletin/2020/pb22539/pb22539.pdf.

[22] Wisconsin Election Commission, 2019 Spring Election EL-190F: Election Voting and Registration Statistics Report (Apr. 2, 2019) spreadsheet at https://elections.wi.gov/node/6513.

### C. State and Local Governments Must Create a Robust Emergency Plan.

Whether or not the crises caused by the current pandemic could have been predicted, we now know that they exist and adversely affect elections. It is therefore incumbent on State and local elections officials to develop a comprehensive emergency plan to address problems that could occur on a rescheduled spring election date, or at the time of the August 11 or November 3 elections, should this (or another) crisis continue or recur.

State law already requires elections officials to be proactive. Wis. Stat.§ 323.02(8)(a) defines "[e]mergency management" to include "all measures undertaken by or on behalf of the state and its subdivisions to . . . Prepare for and minimize the effect of a disaster or the imminent threat of a disaster." The Wisconsin Elections Commission accordingly has a "Contingency Planning and Election Security Plan" which addresses, among other things, disaster planning and instructs local elections officials to develop a range of contingency plans.[23] The plan even mentions the possibility of "influenza or other pandemics that may affect poll workers or [] staff."[24] It discusses things such as the need for standby poll workers, alternative polling places, and communications strategies.

Still, it is abundantly clear that neither the State nor municipalities anticipated anything like the current crisis, nor have they presently implemented a comprehensive emergency plan to address COVID-19. That must change immediately. *Amici* urge the Court to order Defendants to develop a far more detailed and specific plan for responding to the real possibility of further election disruption this year within 45 days of the Court's order, and to require that every

---

[23] Wisconsin Election Commission, Contingency Planning and Election System Security (Oct. 2016), https://elections.wi.gov/sites/default/files/publication/contingency_planning_and_election_system_security__19422.pdf, at 13.

[24] *Id.*; *see also id.* at 13-16.

14

municipality—including Plaintiffs—do the same within 60 days. The chaos and current patchwork system of changing or avoiding legal requirements which led to Plaintiffs' request to delay the election must not recur. Voters, as well as the legitimacy of this and future elections, depend on it.

### D. Municipalities Cannot Ignore the Law.

Among the relief that Plaintiffs seek in their Complaint is that the Court declare "that Plaintiffs will not be subject to liability from Defendants for failure to abide by the Commission's directives and/or Wisconsin election laws . . . ." Am. Compl. ¶ 135, ECF No. 26. *Amici* could not state emphatically enough that this request must absolutely be denied.

Wisconsin elections are operated by more than 1800 municipal clerks. To say that a clerk or other election official could refuse to follow the law is unconscionable—and the official's unlawful action would be unconstitutional. *Amici* understand the serious health concerns that the COVID-19 pandemic raises, but voters' rights cannot be minimized or ignored in response. As discussed *supra*, even a random or arbitrary failure to abide by election laws violates voters' rights to equal protection and due process. A blanket, advance request to refuse to abide by the law, and avoid any penalty for doing so, must be denied.

### IV. CONCLUSION

It is incumbent on this Court to ensure that Wisconsinites are able to exercise their fundamental right to vote. *Amici* have presented information about how registration restrictions and hurdles in casting a ballot could deny qualified Wisconsin voters of this fundamental right, in violation of federal law. Any relief this Court orders should account for these barriers to the ballot.

Dated: March 27, 2020               Respectfully submitted,

                                    /s/ Karyn L. Rotker
Adriel I. Cepeda Derieux*           Karyn L. Rotker (WI Bar No.: 1007719)
T. Alora Thomas-Lundborg            Laurence J. Dupuis (WI Bar No.: 1029261)
Dale E. Ho                          American Civil Liberties Union
American Civil Liberties Union Foundation   of Wisconsin Foundation
125 Broad Street, 18th Floor        207 E. Buffalo Street, Suite 325
New York, NY 10004                  Milwaukee, WI 53202
Tel.: (212) 549-2500                Tel.: (414) 272-4032
acepedaderieux@aclu.org             krotker@aclu-wi.org
athomas@aclu.org                    ldupuis@aclu-wi.org
dho@aclu.org

                                    Kristin Kerschensteiner (WI Bar No.:1035208)
                                    Disability Rights Wisconsin
*Admission to be filed              131 W. Wilson St., Suite 700
                                    Madison WI 53703
                                    (608)267-0214
                                    Kitk@drwi.org


                                    *Attorneys for Amici Curiae*